J-A26029-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

COMMONWEALTH OF PENNSYLVANIA  :  IN THE SUPERIOR COURT OF
                                      :  PENNSYLVANIA
                                      :

            v.                       :
                                        :
                                        :

JAMAL WASHINGTON                 :
                                        :

          Appellant           :  No. 194 EDA 2023

Appeal from the PCRA Order Entered December 22, 2022
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s):  CP-51-CR-0004885-2017

BEFORE:  DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:       **FILED FEBRUARY 08, 2024**

Jamal Washington appeals from the order denying his Post Conviction Relief Act petition, 42 Pa.C.S.A. §§ 9541-46. He claims his appellate counsel was ineffective for failing to raise a due process challenge to a finding of accomplice liability. We affirm.

The trial court previously set forth the following facts:

> On the evening of January 3, 2017, Marcella Vance watched movies with her cousin, Jessica Kidd, and her paramour, the decedent Darryl "Kwan" Curtis, in the back room of her apartment located at 8039 Erdrick Street in Northeast Philadelphia. Vance shared the apartment with her roommate Nashieta [Noland], who was present in the front room with her paramour, [Washington]. At approximately 8:30 p.m., Vance left the apartment to drive Kidd home. Shortly thereafter, both Noland and [Washington] left the apartment, leaving the decedent alone inside.
>
> Between 7:52 p.m. and 8:24 p.m., [Washington] received multiple phone calls from [an] individual named Robert Thorogood and co-defendant Andrew Holder. At 8:24 p.m., [Washington] called Holder. Holder, who was wearing a

global position-tracking electronic monitor while under the supervision of state parole, travelled to the area of 8039 Erdrick Street. There, he and an unidentified individual met [Washington], and all three walked together in the apartment, which Holder entered at 9:35 p.m., armed with a pistol. Inside, Holder searched a safe inside Noland's room and encountered the decedent inside Vance's bedroom. There, he shot and killed the decedent.

Detective Thorsten Lucke, an expert in both video surveillance recovery and cell phone data extraction, recovered video surveillance recordings from private residences at 8052 and 8045 Erdrick Streets, along with video recorded from a church located at the corner of W[e]lsh and Erdrick Streets. Surveillance footage recovered from the corner of Erdrick and W[e]lsh Streets depicted two vehicles make a left-hand turn from W[e]lsh Street onto Erdrick, in the directions of the apartment. The camera located at 8052 Erdrick Street captured video of [Washington], Holder, and another individual walking down Erdrick Street at 9:32 p.m. towards the decedent's location, before disappearing from view. At 9:34 p.m., the cameras at 8052 Erdrick Street recorded [Washington] speaking on a cellular device while walking back towards Welsh Street, away from the crime scene. At 9:38 p.m., both cameras captured Holder, armed with a pistol, running away from the murder scene with the unidentified individual. Holder's positive identity was captured as he ran past the camera located at 8052 Erdrick Street at 9:39 p.m.

Vance, who had dropped Kidd off at her home before purchasing dinner and cigarettes at other locations, called the decedent at 9:48 p.m. but received no response. Upon entering the apartment less than fifteen minutes later, Vance discovered the decedent's body lying in a pool of blood in the back bedroom. After attempting to give CPR, both Vance and her upstairs neighbors called 911. Philadelphia Police Sergeant Conway and Officer Theodore Brown answered a radio call for an unresponsive male. The decedent was pronounced dead at the scene at 10:19 p.m.

Forensic pathologist Dr. Lindsay Simon performed the decedent's autopsy and determined that the cause of death was a single gunshot wound to the head, and the manner of death was homicide. The projectile entered the decedent's

head above the right eyebrow, traveled through his skull and brain, before exiting behind the left ear, causing immediate incapacitation and death. There was no soot or stippling discovered on the body to determine the distance of the shooter.

. . .

Detective Lucke completed a call detail record report on the cellular device attributed to [Washington] on June 7, 2017, which revealed a series of phone calls between his device and those attributed to Holder and Thorogood. At 7:53 p.m., Thorogood placed a call to [Washington], lasting fifteen seconds. At 7:54 and 7:57 p.m., Holder left voicemails with [Washington], who responded with an outgoing call to Holder at 8:24. [Washington] and Holder next communicated at 9:21 p.m., before the instant shooting. [Washington] next placed several calls to Holder between 9:40 p.m. and 9:41 p.m., and again between 10:01 p.m. and 10:09 p.m. that evening. In total, Washington's device recorded twenty-six communications between devices associated with [Washington] and Holder, all of which occurring within the time frame immediately before and after the murder.

Detective Lucke's analysis further revealed that, in the aftermath of the instant shooting, Washington deleted from his cell phone all records of his communications with [Holder] and Thorogood that evening. Cell phone data extraction permitted Detective Lucke to recover some, but not all, of their communications.

Detective James Dunlap, an expert in cellular tower analysis, reviewed data from towers located at 8046 Erdrick Street and .6 miles away from the crime scene on Interstate-95, and identified numerous connections between [Washington's] device and those towers between 8:04 p.m. and 9:54 p.m. on the night of the murder. Additional connections depicted [Washington's] device making two connections at a tower located at Rhawn Street and Roosevelt Boulevard, 1.5 miles away from the crime scene. Nine connections between 10:06 p.m. and 10:10 p.m. show the device travelling along Roosevelt Boulevard before making a connection with the tower at 1831 West

> Allegheny Avenue, which is associated with [Washington's] home address at 1931 West Willard Street.
>
> Analysis of the device associated with Holder (215-880-7871) showed that it connected to the tower associated with the crime scene numerous times between 9:25 p.m. and 10:08 p.m. Analysis of the device associated with Thorogood revealed that the device was not in the area of the crime scene . . . at the time of the shooting.

Trial Court Opinion, 6/22/20, at 2-4, 6-7 (citations omitted).

Washington and Holder proceeded to a bench trial. The trial court convicted Washington of burglary and conspiracy to commit burglary. Prior to sentencing, Washington filed a motion for extraordinary relief. The trial court granted a judgment of acquittal on the conspiracy count because in the criminal information the Commonwealth had only listed murder and robbery as the objectives of the conspiracy. The trial court sentenced Washington to six to 12 years' incarceration.

Washington filed a post-sentence motion, which the court denied. This Court affirmed the judgment of sentence, concluding the evidence was sufficient to support the burglary conviction under conspiracy and accomplice liability theories. **Commonwealth v. Washington**, No. 876 EDA 2020, 2021 WL 2105034, at *6 (Pa.Super. filed May 25, 2021). In October 2021, the Pennsylvania Supreme Court denied Washington's petition for allowance of appeal.

In July 2022, Washington filed a timely, *pro se* PCRA petition. The court appointed counsel, who filed an amended petition. The court issued notice of

its intent to dismiss the petition without a hearing and, after receiving no response, it dismissed the petition.

Washington raises the following issue on appeal: "Whether the court erred in not granting relief on the PCRA petition alleging counsel was ineffective." Washington's Br. at 7.

Washington claims appellate counsel should have argued that the Commonwealth's failure to include a charge for conspiracy to commit burglary was substantially misleading such that a conviction for burglary as an accomplice violated Washington's due process rights. Washington argues that, based on the charge in the information, the Commonwealth was limited to presenting evidence that Washington was a principal actor in the burglary. He contends that because the Commonwealth was unable to establish Washington's presence in the home at the time of the crime, it failed to establish he was guilty of burglary. He maintains that imposing liability as an accomplice when the information charged the defendant as a principal is a fatal variation. He further argues that this is especially true because the Commonwealth represented it would not seek to impose accomplice liability.

Washington notes that the Commonwealth did not charge him with conspiracy to commit burglary, as it had with the murder and robbery charges. He points out that in its closing the Commonwealth stated it was not a conspiracy case and argued that Washington let the co-defendant into the apartment. Washington states: "The Commonwealth did not simply fail to charge Conspiracy to commit Burglary. They intentionally om[]itted the

- 5 -

charge in the Information and presented a theory of the case that was completely contrary to the idea that [Washington] conspired to commit burglary." *Id.* at 18. Washington maintains that his trial counsel's arguments disputing certain facts were to refute the claims of conspiracy to commit robbery and murder, and were not indicative that counsel was arguing against accomplice liability for burglary. He concludes his due process rights were violated "where the Commonwealth significantly misled [Washington] into the belief that he would not be facing a theory of accomplice liability and indeed refused to present a theory that allowed the possibility of [Washington] merely being an accomplice to the burglary." *Id.* at 19-20. He claims there was no reasonable or strategic reason for appellate counsel to not raise the issue.

"Our standard of review from the denial of post-conviction relief 'is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error.'" ***Commonwealth v. Ligon***, 206 A.3d 515, 518 (Pa.Super. 2019) (quoting ***Commonwealth v. Ousley***, 21 A.3d 1238, 1242 (Pa.Super. 2011)).

Washington challenges the effectiveness of his direct appeal counsel. Counsel is presumed effective until a petitioner has proven otherwise. *Id.* at 519. A petitioner may prevail on an ineffectiveness claim only where the petitioner pleads and proves that "(1) the underlying legal claim is of arguable merit; (2) counsel's action or inaction lacked any objectively reasonable basis designed to effectuate his client's interest; and (3) prejudice, to the effect that there was a reasonable probability of a different outcome if not for counsel's

error." **Id.** (quoting **Commonwealth v. Grove**, 170 A.3d 1127, 1138 (Pa.Super. 2017)).

A person is an accomplice of another in the commission of an offense if, with the intent of promoting or facilitating the offense, the person solicits such other person to commit it or aids, agrees, or attempts to aid such other person in planning or committing it. 18 Pa.C.S.A. § 306(c). A defendant may be convicted as an accessory, even though only charged as a principal, if the defendant is on notice that the Commonwealth may pursue a theory of accomplice liability. **Commonwealth v. Spotz**, 716 A.2d 580, 588 (Pa. 1998). A defendant has sufficient notice where the evidence suggests potential liability under an accomplice liability theory, the defense was prepared to argue against accomplice liability at trial, or the defendant was tried jointly with a co-defendant. **See Commonwealth v. Harper**, 660 A.2d 596, 599 (Pa.Super. 1995) (discussing case law). However, a person cannot be held liable as an accomplice if the Commonwealth "misled" the defense or expressly rejected proceeding on an accomplice liability theory. **Id.** at 599-600.

In **Harper**, the Commonwealth did not seek an accomplice liability instruction until after closing arguments, and the court gave the instruction. This Court held that to determine whether a defendant had sufficient notice of the possibility of liability as an accomplice, courts must "carefully review the record to determine whether [the defendant] had sufficient notice of the

potential for an accomplice theory despite being charged as a principal and whether [the defendant] was misled by the Commonwealth." *Id.* at 599.

This Court held the defendant there had sufficient notice because the evidence suggested the possibility of accomplice liability. The Court reasoned that although the Commonwealth had focused on the defendant as the shooter, the witnesses had also testified to observing two people being involved in the shooting. *Id.* It noted that the only thing that could be "remotely characterized as the Commonwealth's 'misleading' the defense is the prosecutor's failure to request the accomplice charge prior to closing," and that was not a sufficient basis to justify refusal of the instruction. *Id.*

Here, the PCRA court concluded:

> Far from misleading [Washington] or expressly rejecting proceeding on an accomplice liability theory, the Commonwealth's case at trial focused on how [Washington] orchestrated the burglary of his paramour's home with Holder. On the night of the burglary, despite informing his paramour that he was returning home, [Washington] remained in the vicinity of the residence and contacted Holder. Holder travelled across the city to meet with [Washington] before [Washington] escorted Holder and another unidentified individual to the burglary site. At trial, trial counsel argued against accomplice liability by disputing that . . . [Washington] escorted Holder to the house and argued that the Commonwealth had no evidence that his phone calls that night were criminal in nature.
>
> Appellate counsel cannot be deemed ineffective because the Superior Court held that the evidence was sufficient to sustain the conviction under accomplice liability theory. ***Commonwealth v. Jamal Washington***, 876 EDA 2020, *10-12 (Pa.Super. May 25, 2021) (unreported memorandum).

Trial Court Opinion, Dec. 22, 2022, at 7-8.

The record supports the PCRA court's finding that the underlying claim was meritless. Washington was tried with a codefendant and the evidence showed that multiple people participated in the crime. Further, although the Commonwealth in its closing stated that it was not a case of conspiracy to commit burglary, its discussion of accomplice liability did not stop there. It clarified that it was "a multifaceted situation. They went in there with the intention of taking whatever was in the safe, and they went in there with the intention of robbing Daryl Curtis." N.T., Dec. 4, 2019, at 51.[1] Washington had sufficient notice that he could be held liable for burglary as an accomplice, and the Commonwealth did not mislead him.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 2/8/2024

---

[1] On direct appeal, this Court further found the evidence sufficient to support conspiracy liability for the burglary conviction. Washington does not discuss this finding in his PCRA petition or appellate brief.